UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

MICHAEL COLEMAN,                                    :

                            Petitioner,           :

          - against -                             :

FRANK SQUILLIANTE, Warden of                        :
Gouverneur Correctional Facility,

                                   :

                           Respondent.
--------------------------------------------------------x

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
JED S. RAKOFF**

06 Civ. 13518 (JSR)(FM)

**FRANK MAAS,** United States Magistrate Judge.

I.      <u>Introduction</u>

            Petitioner Michael Coleman ("Coleman") brings this habeas corpus proceeding, pursuant to 28 U.S.C. § 2254 ("Section 2254"), to challenge his conviction on one count of Attempted Assault in the First Degree and one count of Assault in the Second Degree following a jury trial in Supreme Court, New York County.  On April 3, 2002, Justice Rena Uviller, before whom the case was tried, sentenced Coleman to concurrent prison terms of four years and two years, respectively, on these counts.

            In his amended habeas petition ("Petition" or "Pet."), Coleman argues that: (a) the trial court violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution by admitting (i) an audiotape of a "911" call placed by an unidentified bystander and (ii) statements to the police by non-testifying

bystanders; (b) the People either violated his <u>Brady</u>[1] rights by failing to disclose a forensic analysis or engaged in misconduct by failing to conduct such an analysis; (c) the trial court ruled inconsistently by admitting a bystander's "911" call but excluding an audiotape of his own "911" call; (d) the People engaged in more than one hundred instances of prosecutorial misconduct during the trial and improperly denied him the right to testify before the grand jury; (e) the trial judge engaged in judicial misconduct; and (f) his trial lawyer's errors were so significant that they denied him his Sixth Amendment right to effective assistance of counsel.

For the reasons set forth below, Coleman's habeas petition should be denied. Additionally, Coleman should be denied a certificate of appealability because he has failed to make the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2).

II.   <u>Background</u>

  A.   <u>Trial</u>

    1.   <u>People's Case</u>

The People's proof at trial would have permitted a reasonable juror to find that Coleman assaulted the sixty-nine-year-old driver of a car after a minor traffic accident. The driver, Jim Enterline ("Jim"), and his sixty-eight-year-old wife Esther Enterline ("Esther"), had attended a play in the Theater District on the evening of August

---

[1]     <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

31, 2001.  (T1. 108, 111, 114; T2 34).[2]  After the play, Jim drove the couple in their 1992

Ford Taurus station wagon north on Tenth Avenue in order to return to their apartment on

the Upper West Side.  (T1. 116-18; T2. 34, 36, 39).  Between 46th and 47th Streets, Jim

noticed a "Cadillac size" limousine driven by Coleman moving dangerously close to the

Taurus' left side in an apparent attempt to change lanes.  (T2. 40, 89).  To avoid a

collision, Jim moved one lane to the right, but the limousine continued to crowd the

Taurus, forcing Jim to move into the far right lane.  (Id. at 41-42).  Coleman followed Jim

into that lane and proceeded directly behind him.  (Id. at 42-43).

At 48th Street, Jim braked in order to avoid traffic in front of him, and

when he did so the limousine tapped the rear bumper of his car.  (T1. 216; T2 42-43).  Jim

pulled over and exited his car in order to determine whether there was any damage and

exchange identification and insurance information with Coleman.  (T2. 44, 97).  As Jim

approached the Taurus' rear bumper, Coleman, who also had pulled to the side, angrily

yelled "There is no damage" and "I'll break you."  He then punched Jim in the face and

knocked him to the ground.  (T1. 124; T2. 45-47).  Hearing the commotion, Esther, who

had severe osteoarthritis and walked with a cane, exited the Taurus to attempt to separate

the men.  (T1. 109-10, 127-28).  By the time she reached her husband, he was on his feet

---

[2]    "T1. __" refers to the first volume of the trial transcript.  "T2. __" refers to the
separately-paginated second volume of the trial transcript.  "S. __" refers to the sentencing
minutes.  "P. __" refers to the transcript of pretrial proceedings on February 28, 2002.  "Ex. __"
refers to the exhibits annexed to the Declaration of Assistant District Attorney Jodi A. Danzig,
dated February 26, 2007.

3

again, face to face with Coleman.  (Id. at 127).  Esther tried to protect her husband by inserting herself between the two men, holding her metal cane horizontally with both hands.  (Id. at 128).

As Esther raised the cane, Coleman ripped it from her hands and pushed her to the ground.  (T2. 51).  He then gripped the cane like a baseball bat and struck Jim in the forehead, knocking him to ground.  (Id. at 52-53).  As Jim struggled to stand up, Coleman forcefully struck him in the head and shoulders with the cane between six and twenty times.  (T1. 130, 186; T2. 52).  By this point, the altercation had attracted a crowd of fifteen to twenty bystanders, including William Gee ("Gee"), who testified that he witnessed Coleman strike Jim viciously with the cane some six to eight times.  (T1. 175, 183-86).  Gee tried to break up the fight by yelling "please stop."  (Id. at 206).  Another bystander, a large male, apparently succeeded in doing so either by grabbing Coleman or by threatening to hit him if he touched Jim or Esther again.  (Id. at 132).

Within minutes, in response to a "911" telephone call, police officers John Hawthorne ("Officer Hawthorne") and Joseph Barosa arrived at the scene.  (Id. at 216).  Officer Hawthorne observed the crowd "yelling and screaming" and standing around Jim.  The officer noticed that Jim had cuts on his forehead and nose and that his face and shirt were covered with blood.  (Id. at 217).  He also saw Esther leaning against the Taurus, clutching her side in apparent pain.  (Id.).  After numerous witnesses in the crowd explained what had occurred, Officer Hawthorne arrested Coleman.  Although Coleman's

physical condition appeared normal, the officer escorted him to the hospital because Coleman complained that he was suffering from back pain related to a prior injury. (Id. at 217, 222-23). Coleman told Officer Hawthorne that it was Esther who had thrown Coleman to the ground and that the couple were faking their injuries. (Id. at 229).

An ambulance transported Jim and Esther to the emergency room of St. Claire's Hospital. (T2. 4, 8). Esther did not suffer any serious injuries. Jim, on the other hand, had significant facial bruising and bleeding and a broken nose. He needed stitches for the lacerations on his face. (Id. at 12-13). Jim also tore a ligament in his right pinky finger and had to wear a splint for several months. (Id. at 71-72).

2.  Defense Case

Coleman was the sole defense witness. He testified that both cars pulled to the curb after the Enterline's Taurus sideswiped his car. (Id. at 118-19). According to Coleman, he was particularly alert at the time because the accident scene was near a park frequented by drug dealers and prostitutes. Indeed, he thought Jim and Esther might be trying to rob him. (Id. at 132-33).

Coleman testified that Jim and Esther exited their car quickly and started yelling at him. (Id. at 133). Jim then poked Coleman in the chest with his fingers and Esther struck Coleman on the head with her cane. (Id. at 124-25). Coleman defended himself by grabbing the cane from Esther, pushing Jim to the ground, and throwing the

cane at him.  (Id. at 125-26).  He claimed that he therefore had possession of the cane for

no more than ten seconds.  (Id. at 138).

Coleman stated that the two men subsequently "started swinging" at each

other after Jim got up.  (Id. at 126).  Both men then fell to the sidewalk.  Coleman felt

severe pain in his back due to a prior injury which had resulted in a spinal fusion and the

installation of a stainless steel frame that held his back together.  (Id. at 127).  Despite his

injury, however, Coleman managed to rise and call "911" from his cell phone.  (Id. at

129).

3.     Pretrial Proceedings

Prior to trial, the People made an in limine motion to exclude an audiotape

of Coleman's "911" telephone call but admit the unidentified bystander's "911" call.  (P.

8-9).  Justice Uviller listened to both tapes, initially reserving decision on their

admissibility.  (T1. 11).  Although the minutes of Justice Uviller's evidentiary rulings

with respect to the calls could not be transcribed because the court reporter's notes are

missing, it is clear that the in limine motion was granted.[3]  (See id. at 63).  The prosecutor

consequently played the tape of the bystander's "911" call for the jury.  (Id. at 244-46).

_____

[3]     A certification regarding the search for the missing notes appears immediately
before the transcript of the voir dire in the volume of transcripts filed with the Court by the
Respondent.  (See Docket No. 9).

6

The transcript of the call was not marked as an exhibit at trial. However, Coleman has submitted a transcript of the call. (See Pet. Ex. B). According to Coleman, the transcript of the bystander's call reads as follows:

PO:[4]       Police Operator 2199 . . .

YMH:      Can I get a [car] for, West 48th Street and 10th Avenue please?

PO:        West 48th Street and 10th Avenue Manhattan?

YMH:      Right, Ma'am.

PO:        What's the emergency?

YMH:      Um, a man just jumped out and beat on his, a, another man and his wife. He beat her with a cane.

PO:        Assault with a weapon, outside?

YMH:      Yes, . . . There's two cars parked right here, they had a little confusement [sic] and then, he jumped on the wife, and the husband, and beat them with a cane. They're both bleeding real bad.

PO:        What does the guy look like? White, black, Spanish?

YMH:      Well, he's standin' right here, the guy's standin' right here. He's white. . . .

_____

[4]        "PO" refers to the operator of the "911" call. "YMH" refers to the bystander who placed the call, apparently a young Hispanic male. "D" refers to Coleman. "BBM" refers to a male voice that can be heard in the background during the call.

PO:        What's he wearing?

YMH:       . . . Male White.  Black pants, white
           shirt, and a, a, a burgundy tie. . . .  The
           one of the guys is bleedin' real bad.

D:         Get away!  You better . . .

BBM        . . . stop yellin' at her. Wait 'till the
           police come.

D:         Get away!

BBM:       Wait 'till the fuckin' cops come.  Don't
           hit'em no more, or I'll hit[] you.  Good!
           You brave!  I wish you would.  I wish
           you would so I could knock you up.

YMH:       He ain't worth it man . . . he got it
           comin', don't you worry. . . .

PO:        Hello?

YMH:       Yeah . . . you know there's a big thing
           goin' down.  This man is jumpin' on this
           man and his wife.

PO:        OK.

YMH:       You know, with a cane.

PO:        Police and – police and ambulance are
           both on the way, OK?

YMH:       All right, OK.

BBM:       Don't hit that fuckin' lady again, I'll
           punch you . . . I wish you . . .

YMH:        They on the way.  They on the way. . . .

BBM:        I wish you would.

(Id.).

The transcript of the call that Coleman made to "911" indicates that he was breathing heavily.  Coleman reported that he had been the victim of "an assault."  (Id.). The voice of the "BBM," heard yelling at Coleman in the bystander's "911" call, can also be heard during Coleman's "911" call.  (Id.).

4.      Jury Charge, Verdict, and Sentence

At the request of Coleman's counsel, the court instructed the jury with respect to the defense of justification as part of the jury charge.  (T2. 257).  Despite that defense, on March 11, 2002, the jury returned a verdict finding Coleman guilty of Attempted Assault in the First Degree and Assault in the Second Degree as a consequence of his attack on Jim.  (Id. at 290).  Coleman was acquitted on a third count charging him with Attempted Assault in the Third Degree in connection with his attack on Esther. (Id.).  On April 3, 2002, Justice Uviller sentenced Coleman to four years on the Attempted Assault in the First Degree count and two years on the Assault in the Second Degree count, to run concurrently.  (S. 9).  Before imposing sentence, the Justice noted that

> [t]he notion that these elderly people would instigate or did
> instigate anything against Mr. Coleman is so absurd, and, as I
> said, Mr. Coleman is so bizaarely [sic] out of touch with
> reality that he is a greater danger than I thought or is

9

> incapable of telling the truth, it is really a rather shocking
> thing.

(Id.).

B.    Direct Appeal

Coleman appealed his conviction to the Appellate Division, First

Department, raising as his sole issue a claim that the trial court violated his rights under

the Confrontation Clause of the Sixth Amendment by admitting the bystander's "911" call

and Officer Hawthorne's testimony that "everyone" in the vicinity was "screaming that's

the guy."  (See Ex. A).

On March 22, 2005, the Appellate Division unanimously affirmed

Coleman's conviction.  See People v. Coleman, 16 A.D.3d 254 (1st Dep't 2005).  The

court held that the "911" call was placed "for the purpose of urgently seeking police

intervention" and therefore was nontestimonial and not violative of the Confrontation

Clause.  Id. at 254-55.  The court further concluded that the statements made by

bystanders during the call were properly received under both the excited utterance and

present sense impression exceptions to the hearsay rule.  Id. at 254.  Finally, the court

found that Coleman's counsel had "failed to preserve any argument, including any

constitutional argument," that Officer Hawthorne's testimony regarding the bystanders'

statements was improper.  Id. at 255.  The court noted, in the alternative, that if it were to

reach that claim, it would hold that the bystanders' declarations were not testimonial or

that any error was harmless in view of the "overwhelming evidence of [Coleman's] guilt." Id.

Coleman sought leave to appeal to the Court of Appeals. On August 16, 2005, that application was denied. See People v. Coleman, 5 N.Y.3d 805 (2005) (table).

C.    Motion to Vacate Judgment

On October 14, 2006, Coleman filed a pro se motion to vacate his judgment of conviction pursuant to Section 440.10 of the New York Criminal Procedure Law ("CPL"). In that motion, Coleman claimed that he was denied the effective assistance of trial counsel because his counsel failed to (a) retain an accident reconstructionist, (b) present a justification defense, (c) call an expert medical witness, (d) prevent the introduction of the "911" call, (e) present evidence of his driving record and disability, and (f) object to prosecutorial and judicial misconduct. (See Ex. G). On January 3, 2007, Justice Uviller denied the motion. (Ex. I). The Justice held that the arguments Coleman claimed his counsel failed to advance were not essential to an adequate defense, and that trial counsel was not ineffective simply because the court held that the "911" call was admissible. The Justice also noted that Coleman did in fact testify about his disability and driving record and that he failed to provide factual support for his prosecutorial misconduct claim. (Id. at 2). Additionally, she remarked that "counsel made appropriate pretrial motions, obtained hearings to suppress evidence, vigorously cross-examined witnesses and raised appropriate objections." (Id.). For these reasons, she concluded that Coleman's counsel provided meaningful representation. (Id. at 3). On February 27,

2007, the Appellate Division denied Coleman's request for leave to appeal this decision.

(Decl. of Ass't Dist. Att'y Jodi A. Danzig, dated Aug. 29, 2007 ("Danzig II"), Ex. C).

D.    Habeas Petition

Coleman timely filed his original habeas petition, which is dated October

28, 2006, on November 28, 2006.[5]  (See Docket No. 2).  In that petition, he reasserted the

Confrontation Clause claims raised in his brief to the Appellate Division.  (Id.).

Thereafter, on November 30, 2006, the matter was referred to me for a Report and

Recommendation.  (See Docket No. 4).

On February 26, 2007, the Respondent filed opposition papers, to which

Coleman replied on April 3, 2007.  (Docket Nos. 7-8, 12).  Because Coleman's reply

raised claims not previously asserted in his original petition, I directed him to file an

amended petition incorporating all of his claims, which he did on June 21, 2007.  (Docket

Nos. 13-14).  In that Petition, Coleman reiterates his Confrontation Clause claims and

further asserts that:  (1) the People either violated his Brady rights by failing to disclose a

forensic analysis of the cars involved in the accident or engaged in misconduct by failing

to undertake such an analysis; (2) the trial court ruled inconsistently by admitting the

_____

[5]      A defendant generally must file a federal habeas corpus petition within one year
after the date that his conviction becomes "final."  28 U.S.C. § 2244(d)(1)(A).  Because Coleman
did not seek a writ of certiorari from the Supreme Court, his conviction became final on
November 14, 2005, ninety days after the Court of Appeals denied his request for leave to appeal.
See Williams v. Artuz, 237 F.3d 147, 150-51 (2d Cir. 2001); Sup. Ct. R. 13(1).  Under 28 U.S.C.
§ 2244(d)(1), Coleman then had one year in which to file his habeas petition.  The running of that
period was tolled on October 14, 2006, when Coleman filed his CPL § 440.10 motion.  See 28
U.S.C. § 2244(d)(2).  Because Coleman filed his original petition on November 28, 2006, while
that motion was pending, it is timely.

12

bystander's "911" call while at the same time excluding his own "911" call; (3) the

People engaged in 108 instances of prosecutorial misconduct during the trial and denied

him the right to testify before the grand jury; (4) the trial judge engaged in judicial

misconduct; and (5) his trial lawyer's errors were so egregious that they denied him his

Sixth Amendment right to effective assistance of counsel.

III.    Discussion

A.    Standard of Review

A habeas corpus petition is not a vehicle to relitigate every issue previously

determined in state court. Herrera v. Collins, 506 U.S. 390, 401 (1993). Instead, a state

prisoner seeking habeas relief under Section 2254 must show by a preponderance of the

evidence that he is "in custody in violation of the Constitution or laws or treaties of the

United States."[6] 28 U.S.C. § 2254(a). The petitioner thus has the burden of proving, by a

preponderance of the evidence, that his rights have been violated. See Jones v. Vacco,

126 F.3d 408, 415 (2d Cir. 1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), provides, in part, that:

---

[6]    On June 20, 2007, Coleman was conditionally released to the New York State
Division of Parole. According to the Department of Correctional Services website (as of
February 26, 2008), Coleman had a post-release supervision maximum expiration date of July
22, 2010. Accordingly, because the Respondent has not advised us otherwise, I have assumed
that Coleman remains under post-release supervision, and therefore he remains in "custody." See
Jones v. Cunningham, 371 U.S. 236, 243 (1963); Earley v. Murray, 451 F.3d 71, 75 (2d Cir.
2006).

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless
> the adjudication of the claim –
>
> (1) resulted in a decision that was <u>contrary to</u>, or
> involved an <u>unreasonable application of</u>, clearly established
> Federal law, as determined by the Supreme Court of the United
> States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit noted in <u>Jones v. Stinson</u>, 229 F.3d 112, 119 (2d Cir. 2000), the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'"  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000).  Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Id.</u> at 409.  This standard does not require that reasonable jurists would all agree that the state court was wrong. <u>Id.</u> at 409-10.  Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" <u>Stinson</u>, 229 F.3d. at 119 (quoting <u>Francis S. v. Stone</u>, 221 F.3d 100, 109 (2d Cir. 2000)).

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Finally, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that: "a determination of a factual issue by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail." Williams, 529 U.S. at 389.

B.      Merits

1.      Confrontation Clause and Hearsay Claims

Coleman's first claim is that his rights under the Confrontation Clause of the Sixth Amendment were violated by the admission of hearsay statements at trial. Specifically, he contends that the trial court should not have admitted the bystander's call to "911." (Pet. ¶ 23). He further contends that Officer Hawthorne should not have been permitted to testify about the hearsay statements made to him at the scene of the arrest by unidentified bystanders. (Id. ¶ 24).

After Coleman's trial, the Supreme Court decided Crawford v. Washington, 541 U.S. 36 (2004), which created a per se bar against the use of testimonial statements

by an unavailable declarant unless the defendant had a prior opportunity to cross-examine the declarant about the statement. See id. at 68-69. Crawford is applicable to Coleman's claim because the case was decided before Coleman's conviction became final on November 14, 2005. See Whorton v. Bockting, 127 S. Ct. 1173, 1181 (2007) (Crawford announced a new rule of criminal procedure); Teague v. Lane, 489 U.S. 288, 310 (1989) (new constitutional rules of criminal procedure are inapplicable to cases that become final before new rules are announced); Mungo v. Duncan, 393 F.3d 327, 333 n.3 (2d Cir. 2004) (conviction becomes final under Teague when the availability of direct appeal has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally decided).

a. "911" Call

Crawford did not expressly resolve whether nontestimonial hearsay statements are to be analyzed under the Confrontation Clause or simply the evidentiary rules otherwise applicable. See Ko v. Burge, No. 06 Civ. 6826 (JGK), 2008 WL 552629, at *9 (S.D.N.Y. Feb. 26, 2008). The Supreme Court resolved that issue in Davis v. Washington, 547 U.S. 813, 817, 823-26 (2006), holding that the Confrontation Clause applies only to testimonial statements. In that case, the trial court admitted an assault victim's recorded statement to a "911" operator, during which she stated that she had just been beaten by her former boyfriend. Id. at 817-19. In response to questions by the operator, the victim, who was not called as a trial witness, identified her assailant by name. Id. at 818. Elaborating on its ruling in Crawford, the Court explained that

16

statements are not testimonial when they are "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Id. at 822. On the other hand, a statement is testimonial if "the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Id. Because the call at issue involved a narrative description of "events as they were actually happening, rather than 'describ[ing] past events,'" id. at 827 (quoting Lilly v. Virginia, 527 U.S. 116, 137 (1999)), the Court held that it was nontestimonial. Id. at 828.

Under Davis, the statements made by the unidentified bystander in his "911" call clearly were nontestimonial. The caller described events either as they were occurring or right after they had occurred, stating that "a man just jumped out and beat" the Enterlines "with a cane." (Pet. Ex. B). Indeed, the bystander emphasized that the victims were "bleeding real bad." (Id.). For these reasons, the call is indistinguishable from the nontestimonial "911" call described in Davis. It follows that the admission of the "911" call did not offend the Confrontation Clause. See, e.g., Jackson v. Senkowski, No. 03 Civ. 1965 (JG), 2007 WL 2275848, at *10 (E.D.N.Y. Aug. 7, 2007) (admission of "911" tape identifying defendant as murderer did not violate Confrontation Clause).

Coleman also contends that the statements on the "911" call were received in evidence in violation of the hearsay rule. It generally is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions," Estelle v.

McGuire, 502 U.S. 62, 67-68 (1991), because "rulings by state trial courts on evidentiary issues, even if erroneous, do not rise to the level of a constitutional violation," Copes v. Schriver, No. 97 Civ. 2284 (JGK), 1997 WL 659096, at *3 (S.D.N.Y. Oct. 22, 1997); accord Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983). To prevail, Coleman consequently must show that the alleged evidentiary error arising out of the admission of the statements was "of constitutional dimension" and deprived him of "fundamental fairness." Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988); see also Roldan v. Artuz, 78 F. Supp. 2d 260, 267 (S.D.N.Y. 2000) (petitioner bears a "heavy burden" in showing that state evidentiary errors deprived him of his constitutional right to a fair trial); McCray v. Artuz, No. 93 Civ. 5757 (LBS), 1994 WL 603057, at *2 (S.D.N.Y. Nov. 3, 1994) (habeas relief only warranted where petitioner demonstrates that the state evidentiary error was of "constitutional magnitude"). For an evidentiary error to rise to this level, it must have had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 623, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Stated somewhat differently, the evidence "must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (quoting Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992)).

Coleman cannot meet this heavy burden because the admission of the "911" call was proper. The statements made during the call fit comfortably within the excited

utterance and present sense impression exceptions to the rule against hearsay. An "excited utterance" is made "contemporaneously or immediately after a startling event – which asserts the circumstances of that occasion as observed by the declarant." People v. Edwards, 47 N.Y.2d 493, 497 (1979). A "present sense impression" is a statement describing "events made by a person who is perceiving the event as it is unfolding." People v. Vasquez, 88 N.Y.2d 561, 574 (1996). Here, the bystander's observations were made either shortly after Coleman attacked Jim and Esther with the cane or as the altercation was still underway. (See Pet. Ex. B ("This man is jumpin' on this man and his wife.")). Moreover, the caller believed that the Enterlines both required immediate medical attention. (Id. ("They're both bleeding real bad.")). The statements therefore were properly received under both the excited utterance and present sense impressions exceptions to the hearsay rule.

Additionally, even if the statements were received in error, Coleman was not deprived of a fair trial. There was substantial other evidence pointing to his guilt, including the testimony of Jim and Esther, of a disinterested witness, and of the emergency room physician, who concluded that Jim's injuries were consistent with having been beaten with a cane. Although the tape recording of the call in effect brought yet another witness before the jury, the case against Coleman would have been overwhelming even in its absence. Nothing about the call therefore could have had a substantial and injurious effect on the jury's verdict, and any alleged evidentiary error was harmless. Fry v. Pliler, 127 S. Ct. 2321, 2328 (2007) (habeas court should determine

prejudice under a "substantial and injurious effect" standard, regardless of whether the "state appellate court recognized [an] error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in [Chapman v. California, 386 U.S. 18, 24 (1967)]").

Coleman therefore is not entitled to any relief based on the trial court's admission of the "911" call.

b.  Declaration of Bystanders

Coleman also contends that his Confrontation Clause rights were violated because Officer Hawthorne was permitted to testify that he arrested Coleman "based on accusations made by members of a crowd that had gathered at the scene." (Pet. ¶ 24). At trial, Coleman failed to object when Officer Hawthorne first testified that people who were in the vicinity when he arrived "pointed out" Coleman as "the man who had beaten [Jim and Esther] up." (T1. 217). Indeed, his counsel objected only when the prosecutor sought to elicit what the crowd was "specifically yelling." And that objection was sustained. (Id. at 218).

Later, after the prosecutor "alluded" to the crowd's statements in her summation, Coleman's counsel sought to have the jury instructed, based on the hearsay evidence rule, that the declarants were not subject to cross-examination. (T2. 229-30). Coleman's counsel later clarified his request, stating that he did not "challenge the admissibility" of the statements, but wanted the jury to be instructed that the declarants did not testify and that cross-examination was not available. (See id. at 231). The trial

court concluded that this was "not an appropriate instruction." (Id.). In its decision, the Appellate Division held that this "generalized objection and vague request for a jury instruction failed to preserve any argument, including any constitutional argument," that the statements made by bystanders to Officer Hawthorne were improperly admitted. Coleman, 16 A.D.3d at 255. The Appellate Division further noted that even if it were to reach the merits, it would find that the bystanders' statements were "not testimonial" and were "harmless in view of the overwhelming evidence of [Coleman's] guilt." Id.

### i. Procedural Default

The first obstacle that Coleman faces with respect to his claim regarding the bystanders' statements to Officer Hawthorne is that it is procedurally defaulted. Under New York law, a party who voices only a generalized objection to the receipt of evidence fails to preserve his claim for review. See People v. Rivera, 33 A.D.3d 450, 450-51 (1st Dep't 2006) (rejecting as unpreserved claim that police officer's testimony regarding statements of uncalled witness "violated the hearsay rule and the Confrontation Clause"). Similarly, a party who fails to interpose a timely objection runs afoul of the New York contemporaneous objection rule. See CPL § 470.05; People v. Cole, 24 A.D.3d 1021, 1025 (3d Dep't 2005). Here, the Appellate Division's decision clearly relied on these firmly established and regularly followed state procedural rules in rejecting Coleman's claim that Officer Hawthorne's testimony violated the Confrontation Clause and deprived him of a fair trial.

It is settled law that a federal court is precluded from reviewing a habeas petitioner's claim if the state court's prior denial of that claim rested on an adequate and independent state ground, such as a procedural default.  See, e.g., Harris v. Reed, 489 U.S. 255, 262 (1989); Wainwright v. Sykes, 433 U.S. 72, 81 (1971).  This Court consequently cannot consider Coleman's claim regarding Officer Hawthorne's testimony unless Coleman can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman v. Thompson, 501 U.S. 722, 750 (1991); Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996); accord Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 809 (2d Cir. 2000).  To demonstrate cause a petitioner must adduce "some objective factor external to the defense" which explains why he did not raise the claim previously.  Murray v. Carrier, 477 U.S. 478, 488 (1986); Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991).  A showing of prejudice requires a petitioner to demonstrate that the failure to raise the claim previously had a substantial injurious effect on his case such that he was denied fundamental fairness.  See Reyes v. State of N.Y., No. 99 Civ. 3268 (SAS), 1999 WL 1059961, at *2 (S.D.N.Y. Nov. 22, 1999).  Finally to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent."  Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001).

In his papers, Coleman fails to make either of the showings necessary to overcome his procedural default.  Accordingly, this Court lacks jurisdiction to consider his Confrontation Clause claim relating to Officer Hawthorne's testimony.

### ii.    Officer Hawthorne's Testimony Was Proper

Even if the Court were able to review Coleman's claim, it would lack merit. The Appellate Division held, in the alternative, that the statements made to Officer Hawthorne by the bystanders were not testimonial.  Coleman, 16 A.D.3d at 255.  As Davis establishes, whether a statement is testimonial turns on whether its primary purpose is to enable the police to meet an ongoing emergency or to establish past events relevant to a later prosecution.  Davis, 547 U.S. at 822.  Here, Officer Hawthorne testified that "everyone [was] yelling and screaming that's the guy," pointing to Coleman.  (T1. 217). Although the police had arrived on the scene, the emergency clearly was not over as the perpetrator remained at large and Jim was lying on the ground covered in blood.  The crowd's statements enabled the officers to determine what had occurred and how best to proceed.  Therefore, the primary purpose of the statements was not testimonial and there was no Confrontation Clause violation.

### 2.    Ineffective Assistance of Counsel Claim

Coleman next asserts that his trial counsel was ineffective.  (See Pet. ¶¶ 41-57).  In order to prevail on this claim, Coleman must demonstrate that (a) his counsel's performance "fell below an objective standard of reasonableness" and (b) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).  Under Strickland, there is a "strong presumption that [a lawyer's] conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  Therefore,

23

a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). As the Second Circuit has noted, "[t]he Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

Coleman presents a litany of objections to the performance of his trial lawyer, including the failure to: (a) obtain a forensic analysis of the automobiles to determine who caused the car accident; (b) object to the admission of the "911" audiotape; (c) object to more than one hundred instances of prosecutorial misconduct; (d) object to persistent judicial misconduct; (e) present an adequate justification defense; (f) call a medical expert to refute allegations of injuries suffered by the Enterlines; (g) introduce evidence of Coleman's excellent driving record and disability; (h) correct a presentence investigation report; (i) register with the Office of Court Administration and discover that the prosecutor also had failed to register; (j) file a Notice of Appeal; and (k) advise Coleman that he was suffering from diabetes, a hernia, and cancer at the time of the trial.[7] (Pet. ¶¶ 55-56).

Most of Coleman's assertions lack any basis in fact. For instance, Coleman's trial counsel: objected in a timely manner, on hearsay and prejudice grounds,

---

[7] Coleman also alleges that his trial counsel "bilked his office mates out of large sums of money." (Pet. ¶ 56). This accusation is unsupported by any evidence.

to the admission of the "911" tape (P. 11, 17-18); elicited testimony from Coleman seeking to establish that he acted in self-defense (T2. 123-26, 132-34); argued a justification defense to the jury in his closing (id. at 177-81, 194-96); successfully requested that the trial judge instruct the jury with respect to the defense of justification (id. at 257-63); elicited testimony that Coleman had a disability due to a stainless steel cage in his back (id. at 127-28); objected numerous times to tactics used by the prosecutors (see, e.g., T1. 137-38, 185, 188, 218; T2. 14, 59, 74-77); and sought revisions to the presentence report (S. 2-3). Coleman also testified during his cross-examination that he was an excellent driver, (T2. 167-68), and the allegation of persistent judicial misconduct is simply not borne out by the record, which fails to reveal any significant improprieties on the part of Justice Uviller.

Turning to Coleman's allegation that both his lawyer and the prosecutor failed to register with the Office of Court Administration, the only evidence that he has submitted to substantiate this claim shows that his trial counsel was late in paying the Office of Court Administration registration fees. (See Docket No. 21 Ex. F). Coleman has presented no evidence, however, that his counsel or the prosecutor was subject to discipline based on their delinquent registration status. Moreover, even if either his counsel or the prosecutor had failed to register properly, Coleman plainly has not shown that he suffered any prejudice as a result.

There similarly is no evidence that Coleman's counsel was suffering from a hernia, diabetes, or cancer at the time of the trial or, if he was, that he failed to advise

25

Coleman of his condition. Coleman also fails to explain how any of these alleged problems might have affected the fundamental fairness of his trial.

Similarly, if trial counsel failed to file a notice of appeal in a timely manner, this plainly cannot be the basis for a successful ineffective assistance claim because Coleman himself filed a timely notice of appeal. (See Danzig II Ex. D). Thereafter, his appeal was perfected by his appellate counsel. (Ex. A). He consequently suffered no prejudice.

Coleman's ineffective assistance claim finds support in the record only to the extent that he complains that his trial counsel failed to call a medical expert or obtain a forensic analysis of the automobiles involved in the accident. However, the Court cannot use hindsight to second-guess sound tactical decisions made by a defendant's attorney at trial. McKee v. United States, 167 F.3d 103, 106 (2d Cir. 1999). For instance, the only injury that the People needed to prove with respect to Jim was that he suffered a "physical injury," something that was virtually indisputable in light of his broken nose and the lacerations to his face. See N.Y. Penal Law § 120.05(2); People v. Chiddick, 8 N.Y.3d 445, 447 (2007) (physical injury "as used in the Penal Law, means impairment of physical condition or substantial pain") (internal quotation marks omitted); People v. Williams, 40 A.D.3d 402, 402-03 (1st Dep't 2007) (bleeding, dizziness, a bruise, and a laceration constitute physical injury); People v. Hazen, 94 A.D.2d 905, 906 (3d Dep't 1983) (broken nose constitutes physical injury). Moreover, Coleman's attorney was able to establish that the People's expert could not rule out certain possible causes of Jim's

injuries for which Coleman could not reasonably have been held responsible.  (See T2. 21-23, 27-28).  In light of this significant concession, there was no need to call a second medical expert.

Similarly, the key issue in this case was what transpired after the two vehicles came to a stop, not what took place before.  Accordingly, the failure to hire an accident reconstructionist to testify does not rise to the level of inneffective assistance of counsel.  See Davidson v. United States, No. 00 Civ. 869, 2000 WL 1772656, at *4-5 (N.D.N.Y. Nov. 28, 2000) (failure to hire an independent forensic pathologist, ballistics expert, and crime scene reconstructionist did not render trial counsel ineffective); Harris v. United States, No. 97 Civ. 1904 (CSH), 1998 WL 635535, at *1 (S.D.N.Y. Sept. 15, 1998) (trial counsel's strategy not objectively unreasonable where retention of forensic accounting expert "would not have been necessary to pursue the implausible theory of the case that petitioner advanced on his habeas corpus motion").  Moreover, even at this late date, Coleman has yet to establish what the testimony of a forensic expert would show.  In the absence of such proof, he cannot satisfy the prejudice prong of the Strickland test. See Maddox v. Lord, 818 F.2d 1058, 1062 (2d Cir. 1987) (claim that defense counsel did not investigate prosecution's forensic evidence failed to meet Strickland test absent any indication that the result would be exculpatory).

Finally, all of Coleman's attacks on his counsel overlook the fact that the prosecution's case was very strong and that the defense that Coleman wished to put forth – painting himself as the victim of an attack by a sixty-nine-year-old man and his disabled

wife – bordered on the absurd. Despite these constraints, Coleman's counsel provided more than adequate representation. Before trial he sought to exclude the "911" tape and prevailed at a Sandoval[8] hearing regarding Coleman's prior robbery conviction. (P. 8-13, 13-17). Thereafter, during the trial, he delivered opening and closing statements and engaged in direct and cross-examination which was intended to bolster Coleman's justification defense. (See T1. 88-104; T2. 175-202). Coleman's counsel also interposed numerous objections to the prosecutor's questions. (See, e.g., T1. 137-38, 218; T2. 14, 59, 74-77). Finally, counsel's efforts were sufficiently persuasive that the jury returned a not guilty verdict with respect to a charge of Attempted Assault in the Third Degree arising out of Coleman's interaction with Ester. (T2. 290).

In sum, although Coleman's counsel's performance may not have been perfect, it was not outside the wide range of professional assistance that Strickland deems adequate. Accordingly, because Coleman has failed to show that his trial counsel's assistance fell below an objective standard of reasonableness, he is not entitled to habeas relief on this ground.

### 3. Police Failure to Conduct a Forensic Analysis

In his Petition, perhaps as a corollary to one of his ineffective assistance of counsel claims, Coleman also argues that the police engaged in misconduct either by failing to disclose the results of a forensic analysis of the cars involved in the accident or

---

[8]    See People v. Sandoval, 34 N.Y.2d 371 (1974).

by failing to conduct such an examination.  (See Pet. ¶¶ 5-13).  The prosecution, however, is not required to perform any tests or use any particular investigatory tools, including forensic analysis, to secure exculpatory evidence for a defendant.  Arizona v. Youngblood, 488 U.S. 51, 58-59 (1988); Sturdivant v. Barkley, No. 04 Civ. 5659 (DLI), 2007 WL 2126093, at *6 (E.D.N.Y. July 24, 2007).  Accordingly, Coleman's claim that the police's failure to perform a forensic analysis deprived him of a fundamentally fair trial lacks a legal basis.

Moreover, in his Petition, Coleman admits that the results of an examination might have shown that he struck the Taurus from behind, thereby "conclusively prov[ing] that [he] was lying."  (Id. ¶ 6).  Any suggestion that the results of an examination would have been exculpatory therefore is sheer speculation.  In these circumstances, Coleman plainly cannot show that the prosecution committed a Brady violation.  See United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004) (to establish a Brady violation, suppressed evidence must be exculpatory or impeaching, and there must be a "reasonable likelihood that disclosure of the evidence would have affected the outcome of the case"); Tinsley v. Kuhlmann, 973 F.2d 163, 166 (2d Cir. 1992) (Brady violation requires showing a reasonable probability that the result of the trial would have been different if evidence had been disclosed).

4.    Other Claims

In his Petition, Coleman raises three other claims for the first time, alleging that: (a) the trial court ruled inconsistently by admitting the bystander's "911" call while excluding the audiotape of his own "911" call; (b) the People engaged in more than one hundred instances of prosecutorial misconduct during the trial and denied him his right to testify before the grand jury; and (c) the trial judge engaged in judicial misconduct. None of these claims were previously raised in state court. Accordingly, they all are unexhausted.

A federal court presented with unexhausted claims in a habeas petition may, in appropriate circumstances, either stay the petition or dismiss it without prejudice, so that the petitioner can return to state court to pursue exhaustion. See Rhines v. Weber, 544 U.S. 269, 276-77 (2005); Zarvela v. Artuz, 254 F.3d 374, 380-81 (2d Cir. 2001). Here, however, Coleman can no longer seek collateral review of his new claims because a defendant who has prosecuted a direct appeal may not subsequently seek collateral review of an issue that could have been raised on appeal but was not. See CPL § 440.10(2)(c); Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994); see also CPL § 440.10(3)(c) (state court may deny claim if it could have been raised in a previous CPL § 440 motion).

Coleman previously could have raised these three claims in state court proceedings but chose not to do so. Accordingly, because the state court would consider Coleman's new claims procedurally barred, this Court must treat them as "procedurally defaulted." See Aparicio, 269 F.3d at 89-90. Federal habeas review therefore is barred

unless Coleman can demonstrate both cause for his default and actual prejudice, or that

the failure to consider his claim will result in a fundamental miscarriage of justice.

Coleman, 501 U.S. at 750.  As noted previously, he has not made either of these showings

in this case.[9]

IV.    Conclusion

For the foregoing reasons, Coleman's habeas petition should be denied.

Furthermore, because Coleman has not made a substantial showing of the denial of a

constitutional right, as required by 28 U.S.C. § 2253(c)(2), a certificate of appealability

should not be issued.

V.     Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have ten days from the service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule

72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered

to the chambers of the Honorable Jed S. Rakoff and to the chambers of the undersigned at

---

[9]    In any event, Coleman's grand jury claim, to the extent it is not procedurally
barred, is plainly frivolous.  In a habeas proceeding, the Court need only determine whether
Coleman's federal rights were violated.  28 U.S.C. § 2254(d)(1).  The right to testify before a
grand jury is guaranteed by New York state law, but not by federal law or the United States
Constitution.  See CPL § 190.50; Brown v. Connell, No. 04 Civ. 10152 (PAC), 2006 WL
1132053, at *6 (S.D.N.Y. Apr. 28, 2006) (Report & Rec. of Gorenstein, Mag. J.); Cates v.
Senkowski, No. 02 Civ. 5957 (LAK), 2003 WL 1563777, at *2 (S.D.N.Y. Mar. 17, 2003); Green
v. Artuz, 990 F. Supp. 267, 273 n.8 (S.D.N.Y. 1998)  Thus, because the right that Coleman seeks
to vindicate is not federally-protected, even if he wished to testify before the grand jury and was
unable to do so, this would not entitle him to any relief in this forum.  See Lopez v. Riley, 865
F.2d 30, 32 (2d Cir. 1989).

the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any

opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any

requests for an extension of time for filing objections must be directed to Judge Rakoff.

The failure to file these timely objections will result in a waiver of those objections for

purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas

v. Arn, 474 U.S. 140 (1985).

Dated:     New York, New York
           August 25, 2008


                               FRANK MAAS
                  United States Magistrate Judge


Copies to:

Michael Coleman
P.O. Box 1721
Radio City Station
New York, New York 10101-1721

Jodi A. Danzig, Esq.
Assistant Attorney General
Attorney General for the State of New York
120 Broadway
New York, New York 10271